UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____

| | |
|---|---|
| JULIO E. ORTIZ | ) |
| Plaintiff, | ) |
| | ) |
| v. | )          Civil No. 4:11-11137-TSH |
| | ) |
| CAROLYN W. COLVIN,[1] | ) |
| Acting Commissioner, | ) |
| Social Security Administration, | ) |
| Defendant. | ) |

_____ )


**REPORT AND RECOMMENDATION TO REMAND THIS MATTER**
March 4, 2014


Hennessy, M.J.

Pursuant to 28 U.S.C. § 636(b)(1)(B), and by Order of Reference (Docket #20), this

matter was referred to me for a Report and Recommendation on Plaintiff Julio E. Ortiz's

("Ortiz") Motion for Order Reversing Decision of Commissioner (Docket #14) and the

Defendant's Motion to Affirm the Commissioner's Decision (Docket #16).  While Ortiz

requested oral argument on this matter, this Court deems a hearing unnecessary.  L.R. 7.1(F).[2]

These motions are ripe for adjudication.

For the reasons that follow, I recommend that the Commissioner's motion be DENIED,

the Plaintiff's motion be ALLOWED, and that the case be REMANDED to the Administrative

Law Judge for further proceedings consistent with this report and recommendation.

_____

[1]    Pursuant to Fed. R. Civ. P. 25(d), Carolyn W. Colvin is substituted for Michael J. Astrue, as
the Acting Commissioner of the Social Security Administration as of February 14, 2013.

[2] A transcript of the Social Security Administration official record ("Tr.") has been filed with the
court.  (Docket #9).

## PROCEDURAL HISTORY

Ortiz filed for Social Security Disability Benefits ("DIB") and Social Security Supplemental Income ("SSI") on June 4, 2009, alleging disability as of November 24, 2008. [3] (Tr. 132, 139).  His claims were denied on August 6, 2009.  (Tr. 63-66).  Ortiz filed for reconsideration of these denials, and was again denied DIB and SSI on December 16, 2009.  (Tr. 69-75).  Ortiz requested a hearing before an Administrative Law Judge ("ALJ").  (Tr. 75).

An ALJ held a hearing on January 11, 2011, at which Ortiz was represented by counsel. (Tr. 33-58).  On January 26, 2011, the ALJ issued his decision denying benefits.  (Tr. 6-26).  In his written decision, the ALJ found that Ortiz was not disabled.  (Tr. 26).  The ALJ's decision was reviewed and affirmed by the Decision Review Board on April 28, 2011. [4]  (Tr. 3).  Ortiz timely filed a complaint seeking review of the ALJ's decision (Docket #1), followed by a motion to reverse the Commissioner's decision (Docket #14).  The Commissioner filed a cross-motion (Docket #16).

Ortiz asserts that the ALJ's decision is not supported by substantial evidence and should be reversed or remanded.  (Docket #15, p. 17).  In support of this position, Ortiz contends that the ALJ improperly discounted his pain and erroneously concluded that Ortiz had residual

---

[3]    The legal standards applied to SSI and DIB claims are the same, but the governing provisions are contained in separate, yet parallel, statutes and regulations.  Given the analogous nature of these provisions, citations in this Report and Recommendation referencing one provision should be considered as reference to the analogous, parallel citation, as context dictates.  This same principle of interpretation applies to citations of statutes and regulations found in quoted court decisions.

[4]    The Decision Review Board was eliminated by the Social Security Administration on July 13, 2011, and its duties were taken over by the Appeals Council.  Eliminating the Decision Review Board, 76 Fed. Reg. 24802-01 (May 3, 2011).  On May 2, 2011, Ortiz submitted a request that the ALJ decision be reviewed by the Appeals Council, (Tr. 1); however, no further action was taken on Ortiz's claim because the opinion of the Decision Review Board constituted the Commissioner's final decision.  (See Tr. 3).

functional capacity ("RFC") to work.  (Docket # 15, pp. 9-14).  He further argues the ALJ gave improper weight to the opinions of state agency medical consultants without considering their qualifications.  (Docket #15, pp. 15-16).  The Commissioner opposes those arguments and seeks to affirm the ALJ's decision that Ortiz is not disabled.

## **FACTUAL HISTORY**

At the time of the ALJ hearing, Ortiz was a 44-year-old man with a wife and two children ages 5 and 13.  (Tr. 35-37, 132, 192).  He has an 11th grade education and past work experience as an automotive technician.  (Tr. 35-38).

According to records and testimony, in 1996, a car hit Ortiz and dragged him for several feet.  (Tr. 36, 180, 260).  He underwent multiple surgeries for his injuries, including skin grafting and fusion of metal plates to the nasal area of his skull.  (Tr. 348).  His pain progressed as he aged.  (Tr. 36, 180, 260).  Ortiz claims back pain began to interfere with his work in 2006.[5]  (Tr. 157).  Medical records from this time detail occasional clinic visits to treat this pain.  (Tr. 149-51).  By November 2008, his pain had progressed to the point where Ortiz claims he could no longer work.  (Tr. 38-40).

In a Function Report completed in 2009, Ortiz reported that he could not lift more than ten pounds, could not squat, bend, or kneel, for more than five minutes, could not stand or sit for more than twenty minutes, could not walk more than 500 feet, and could not reach above his head.  (Tr. 178, 180).  He further reported issues with dressing and bathing.  (Tr. 174).  He also said he experienced headaches related to his back pain.  (Tr. 180).  Ortiz stated that he performed

---

[5]    While Ortiz's applications for SSI and DIB indicate that the pain began to interfere with his work in 2006, (Tr. 157), Ortiz reported that he had back pain in 2005 which had worsened in the three months leading to his first documented clinic visit on June 29, 2006.  (Tr. 348).

light cleaning thirty minutes daily with breaks, left his house once or twice a day if necessary, and accompanied his wife shopping approximately twice a month.  (Tr. 175-76).

At the hearing, Ortiz testified that he is dependent on his wife for meal preparation, assistance with dressing, and getting up in the bathroom.  (Tr. 44).  He said that he uses a cane to walk.  (Tr. 45-47).  Ortiz testified that he still drives, but "not too much."  (Tr. 37).  Ortiz described his pain without medication as being a ten out of ten and, with medication, as a seven/eight out of ten.  (Tr. 40).  When asked about surgical options, Ortiz replied that he elected not to have surgery because he had to care for his children, and because the likelihood of success was estimated at only 50%.  Id.  He treats his pain with medication, but its side effects are drowsiness, dizziness, and blurred vision.  (Tr. 40-43).

## MEDICAL HISTORY

Ortiz claims back pain and headaches caused him to be disabled beginning November 24, 2008.  (Tr. 36, 39, 132, 157).  He first sought treatment for back pain at the Worcester Family Health Center in June 2006.  (Tr. 348).  In her clinic notes, Nurse Practitioner Lana Sargent observed that Ortiz had trouble standing, a limited range of motion, and tenderness in his back.[6] Id.  Ortiz returned to the clinic for back pain again in July.  (Tr. 347).  Nurse Sargent again observed limitations to his range of movement, but reported that Ortiz could stand without assistance.  Id.  She prescribed Ortiz Vicodin, which he elected to take only at night because his work involved heavy machinery; he was told to use Motrin during the day.  Id.  When he returned to the Family Health Center in December 2006 with a diagnosis of walking pneumonia, Nurse Sargent observed that he appeared comfortable sitting in a chair.  (Tr. 346).

---

[6]   One of the records refers to Ms. Sargent as "PA" or a physician's assistant.  (Tr. 217).  The distinction between a nurse practitioner and physician's assistant is unimportant for purposes of analysis under social security guidelines.  See, e.g., 20 C.F.R. § 416.913(a),(d).

At his next clinic visit in March 2008, Ortiz complained of recurring headaches, which Nurse Sargent attributed to work-related stress. (Tr. 291). However, in light of his history of medical trauma, she sent Ortiz for an MRI to ensure no complications were present; none were found by the radiologist. (Tr. 213).

In October 2008, Ortiz returned to the Family Health Center for back pain, which he said had worsened over the prior month and interfered with his work. (Tr. 290). During the examination, Nurse Sargent observed that Ortiz had difficulty sitting comfortably, but was able to stand, had limitations in his range of motion, and tenderness in his spine and surrounding muscles. Id. For treatment, Ortiz received an anti-inflammatory injection. Id. A second MRI was ordered, and it showed minimal disc degeneration as well as some arthritis in his spine. (Tr. 215-16, 290). Based on the results of the MRI, Nurse Sargent characterized Ortiz's pain as likely musculoskeletal. (Tr. 289).

Just after his date of disability allegedly began (November 24, 2008), Ortiz had a December 2008 check-up with Nurse Sargent. She observed Ortiz and noted he was probably experiencing "some increased nerve sensitivity pain." (Tr. 288). Ortiz reported continuing medication therapy for his pain, which he said diminished it to a five or six out of ten. Id. Nonetheless, he considered the pain to be worsening. Id.

From December 1, 2008, until February 19, 2009, Ortiz attended physical therapy in an effort to relieve his reported lower back pain. (Tr. 222-59). Despite twenty-two physical therapy sessions, little improvement was observed and the therapist noted that Ortiz did not meet his treatment goals. (Tr. 225). As Ortiz continued to suffer back pain, the physical therapist

recommended a home TENS unit and ceased physical therapy sessions when Ortiz was sent to the chiropractor for further evaluation.[7]  Id.

During January 2009, Ortiz consulted with Dr. James Eck regarding his back pain.[8]  (Tr. 260-61).  Dr. Eck observed that Ortiz appeared healthy and walked with a slow, steady gait, but that he was in "moderate distress secondary to his pain."  Id.  Dr. Eck did not find any significant tenderness, masses, or muscle spasms in the spine, and he reported that muscle tone and bulk were normal.  Id.  Upon review of prior MRIs, Dr. Eck made findings similar to the radiologist, noting mild-to-moderate arthritis.  Id.  Dr. Eck did not consider Ortiz to be a candidate for surgery; instead, he referred him to a physiatrist about the possibility of injections into the small joints in his spine.  (Tr. 261).

On Dr. Eck's referral, Ortiz met with Dr. David Mazin on February 17, 2009.[9]  (Tr. 262-63).  At this initial consultation, Dr. Mazin observed Ortiz's limited range of motion.  (Tr. 262).  He noted spinal tenderness and a small disc protrusion.  Id.  Dr. Mazin prepared notes regarding Ortiz's pain, provided a diagnosis stemming from degenerative disc disease, and theorized that a lumbar medial branch block might help alleviate some of Ortiz's back pain.  (Tr. 263).  Because Ortiz was beginning chiropractic therapy and continuing to undergo physical therapy at the time

---

[7]   The Court accepts the Commissioner's definition of a TENS unit as a "transcutaneous electrical nerve stimulation" device which produces an electrical current to stimulate nerves for therapeutic purposes.  (Docket #17, p. 5, n. 5).

[8]   In the record Dr. Eck is referred to as James Eck, D.O., M.S.  (Tr. 261).  The applicable abbreviation for D.O. refers to Doctor of Osteopathy and M.S. refers to Master of Surgery.  Dan J. Tennenhouse, 1 Attorney's Medical Deskbook §§ 5.01, 5.15 (4th ed. 2013).

[9]   In the medical records Dr. Mazin is referred to as David Mazin, MD.  (Tr. 317-21).  The only indication of Dr. Mazin's specialty is found by comparing medical records referencing Dr. Eck's intention to refer Ortiz to a physiatrist, (Tr. 261), and the subsequent report by Dr. Mazin recounting that Ortiz was referred to him by Dr. Eck (Tr. 262).

of this consultation, Dr. Mazin ordered a review of his condition in six weeks to further discuss the feasibility of medial branch block injections.  Id.

Two days later, on February 19, 2009, Ortiz met with James Convery, D.C. to begin chiropractic therapy.[10]  (Tr. 296).  Mr. Convery observed Ortiz had a decreased range of movement in his spine as well as muscle spasms.[11]  (Tr. 297).  He considered Ortiz to be mobile, but did not opine on how long Ortiz was capable of standing or walking.  Id.  Mr. Convery performed several tests, made findings, and diagnosed Ortiz with moderate lower back pain.  (Tr. 306).

Ortiz also followed up with Nurse Sargent in February 2009, at which time she recorded several observations, including a continued tenderness in Ortiz's lower back.  (Tr. 342).  At this time, Ortiz reported that pain from the scar tissue on his head had improved with the prescribed Neurontin.  Id.  No significant changes were reported at his next visit with Nurse Sargent in March 2009.  (Tr. 284).

Ortiz followed-up with Dr. Mazin on March 31, 2009.  (Tr. 264).  Dr. Mazin again observed a limited range of motion in the spine and tenderness in Ortiz's spinal muscles on physical examination.  Id.

By April 2009, Ortiz reported to Nurse Sargent that he continued to experience a "moderate amount of pain," but that it was under "good control" due to pain medications.  (Tr.

---

[10]   The applicable meaning of D.C. refers to a Doctor of Chiropractic.  Tennenhouse, 1 Attorneys Medical Deskbook at § 5.6.  Under the regulations, chiropractors are not considered to be "treating sources;" rather, they can be "other sources" of medical evidence and opinions, similar to nurse practitioners.  20 C.F.R. § 416.913(d)(1).

[11]   Several other bases for his medical opinion were listed, but the meaning of these shorthand abbreviations was not made clear either by the ALJ or by other consultative sources.  (See Tr. 297).  Several more pages of notes from Dr. Convery were indecipherable to this Court and their meaning similarly could not be gleaned from the ALJ decision or any medical consultation in the record.  (Tr. 298-303).

340).  Nurse Sargent observed that Ortiz sat comfortably on the examination table.  Id.  She

again noted some limitations in bending and straightening of his back as well as muscle

tenderness in his spine.  Id.

Dr. Mazin performed a medial branch block in May 2009.  (Tr. 317).  Notes from

immediately after the procedure reveal no complications, and that Ortiz left the facility in good

condition.  Id.  At a follow-up two weeks later, Ortiz reported no relief from the branch block,

and Dr. Mazin observed that Ortiz continued to have a fifty-percent limitation in range of

motion.[12]  (Tr. 316).  He noted Ortiz's pain was likely due to a disc issue.  Id.

At a physical examination on June 11, 2009, Nurse Sargent observed that Ortiz continued

to have a limited range of motion in his spine.  (Tr. 339).  Ortiz reported that Percocet reduced

his pain from an eight to a four; but if the pain was not "extreme," he would forego a dosage.  Id.

Ortiz also reported feeling sad that he could not engage with his children and frustrated that his

pain had not dissipated.  Id.

In July 2009, the first state agency consultant completed his report based on medical

evidence submitted through that time.  (Tr. 307-14).  Medical consultant Shankar Narayan

concluded that Ortiz's claims of high levels of pain did not comport with the evidence in his

medical file, and his headaches were not documented as severe.[13]  (Tr. 308-09).  He cited

evidence that Ortiz was independent and used no assistive mobility device.  (Tr. 308).  Mr.

---

[12]   Ortiz testified before the ALJ that the injections actually made his back pain worse.  (Tr. 49).

[13]   In his decision, the ALJ refers to this medical consultant as Mr. Narayan.  (Tr. 23).  In his motion before this Court, Ortiz asserts that Mr. Narayan is a speech pathologist rather than a medical doctor.  (Docket #15, p. 16).  The Commissioner does not directly address this argument.  (Docket #17, p. 13) ("[A]s the Plaintiff mentions, neither state agency doctor had a specialty in orthopedics, meaning that specialty was not relevant in this case").  The Court accepts Ortiz's characterization of Mr. Narayan as a speech pathologist.  Under the regulations, speech pathologists are an "acceptable medical source" for "purposes of establishing speech or language impairments only."  20 C.F.R. § 404.1513(a)(5).

Narayan also noted that treating physicians reported Ortiz was in pain and had to shift positions; that the medial branch block injections were tolerated well, but were ineffective; and that reflexes and sensations were normal.  Id.  Mr. Narayan postulated that Ortiz could stand at least two hours and sit about six hours, during an eight-hour workday.  Id.  He opined that Ortiz would frequently be able to carry weight less than ten pounds and could make unlimited push and pull movements.  Id.  He cautioned Ortiz to avoid concentrated exposure to extreme cold, noise, and hazards.  (Tr. 311).

In August 2009, Ortiz reported high levels of pain at his check-up with Nurse Sargent. (Tr. 337).  He described his pain as an eight or nine out of ten, and indicated that he typically took three Percocets per day to reduce the pain to a six.  Id.  Nurse Sargent observed his limited range of motion, and difficulty in sitting comfortably and in standing.  Id.  Because Ortiz had exhausted his options for physical and chiropractic therapy, Nurse Sargent recommended that he start controlled-release morphine to reduce his pain to a functional level.  Id.

By September 2009, Ortiz reported to Nurse Sargent that he had some improvement in his activities of daily living ("ADLs"), but still needed assistance putting on his shoes.  (Tr. 365). He also said that his back pain had improved, that he was sleeping better, and that pain around the scarring on his head was improved by the prescribed pain medication.  Id.  He still rated his pain as eight/nine out of ten without medication, and a four/ five out of ten with medication.  Id. Nurse Sargent observed Ortiz was sitting slightly uncomfortably, but was able to get up from a chair without assistance.  Id.  She also observed limitations in bending and straightening his back, and continued tenderness near his spine.  Id.  Approximately two months later, she changed Ortiz's prescription medication, which had a slightly positive effect.  (Tr. 379, 381).  By

December 13, 2009, Ortiz reported that he slept more soundly and his pain was a six out of ten; however, he said that most days he was still uncomfortable.  Id.

In December 2009, a second state agency consultant completed a report based on evidence submitted through November 2, 2009.  (Tr. 375).   Dr. Romany Hakeem Girgis affirmed the RFC assessment previously made by Mr. Narayan on July 31, 2009.[14]  Id.  He concluded that based on the records, Ortiz could lift ten pounds on occasion, five pounds frequently, and could stand for two hours of an eight-hour work day.  Id.

As a further course of treatment in January 2010, Ortiz received a personal TENS unit. He reported some relief to Nurse Sargent.  (Tr. 376).  Despite the pain relief, she observed Ortiz continued to have limited range of motion and that he was unable to sit for more than five minutes on the examination table.  (Tr. 377).  She observed he was more comfortable standing, but still had tenderness across his back.  Id.  A new MRI was taken on January 26, 2010, and it indicated no notable changes from 2008.  (Tr. 382).

A check-up with Nurse Sargent on March 10, 2010 revealed that Ortiz considered his pain to be five or six out of ten.  (Tr. 412).  He was taking methadone twice a day.  Id.  At the time of this report, Ortiz denied any pain radiating down his legs.  Id.  He maintained that it was difficult to perform most ADLs.  Id.  He denied experiencing headaches, blurred vision, dizziness, fever, or chills, but did report pain in his chest.  Id.  Nurse Sargent observed Ortiz sat uncomfortably on the examination table and leaned to the right.  (Tr. 411).  He was unable to bend forward, and had limited side-to-side movement as well as tenderness in his spine.  Id.  She

---

[14]    In his motion, Ortiz contends that Dr. Girgis specializes in neonatology.  (Docket #15, p. 16).  The Commissioner appears not to dispute this fact.  (Docket #17, p. 13) ("[A]s Plaintiff mentions, neither state agency doctor had a specialty in orthopedics, meaning that specialty was not relevant in this case.").  The Court accepts Ortiz's contention.

determined his headaches had been resolved.  Id.  At a check-up later that month, Ortiz reported that use of methadone reduced his pain level to five out of ten.  (Tr. 408).

Due to his ongoing reports of chronic pain, Nurse Sargent referred Ortiz to the Clinton Pain Management Center.  (Tr. 388-89).  He was admitted on March 29, 2010 and, on initial examination, Dr. Donald Stevens found that Ortiz's lower back pain appeared to stem from a combination of muscular and disc issues.[15]  (Tr. 394).  As for the headaches, Dr. Stevens hypothesized that they were possibly due to scarring from a prior injury, and he recommended consulting a neurologist if medication proved to be ineffective.  (Tr. 392).  Dr. Stevens recommended a surgical evaluation to see if fusion surgery could alleviate Ortiz's back pain, and he offered to make a referral.  Id.  He noted that Ortiz appeared reluctant to have surgery due to the risks, and instead preferred to continue with medication management for his pain.  Id.  He advised Ortiz to continue using the TENS unit, to use heat and stretching, and, to continue with medication on a long-term basis for his back pain.  Id.  Dr. Stevens also recommended switching his medication to lessen the risk of cardiac arrhythmia.  Id.

In early April 2010, Ortiz again reported to Nurse Sargent that his pain level was five out of ten, but she observed a decreased range of motion.  (Tr. 407).  No changes in Ortiz's range of motion were noted in her report at the following month's check-up.  (Tr. 402-04).

Ortiz began mental health therapy in August 2010.[16]  (Tr. 444).  The purpose of these sessions was to introduce Ortiz to a psychological pain management program intended to aid him in "identif[ying] irrational thoughts and emotions associated [with] pain" as well as stressors that

---

[15]   According to the submitted medical records, Dr. Donald S. Stevens specializes in anesthesiology.  (Tr. 388).

[16]   A report by Nurse Sargent on May 6, 2010, indicated that Ortiz was already engaged in mental health therapy at that point, but there were no therapy records dating that far back.  (Tr. 402-03).

augment and exacerbate pain.  Id.  At the second session, Ortiz reported that a recent car accident

had aggravated feelings of sadness and anxiety, but Dr. Ramos indicated that little distractibility,

anxiety, or frustration were apparent in his demeanor.[17]  (Tr. 443).  By September 20, 2010, Dr.

Ramos determined that Ortiz showed positive results in efforts to manage his pain.  (Tr. 441).

Ortiz reported feeling less anxious and depressed and was happy because he could control his

pain effectively.  Id.  Ortiz also began using a cane to help him move around and remain in a

standing position.  (Tr. 432).

     In the first week of January, just before the January 11, 2011 ALJ hearing, Nurse Sargent

performed a physical examination of Ortiz and completed an RFC worksheet.  (Tr. 426-29).

Based on this examination, Nurse Sargent concluded that Ortiz would be able to occasionally

carry ten pounds and frequently carry less than ten pounds.  (Tr. 426).  She reported that Ortiz

could stand for about two hours, and sit for two hours, in an eight-hour work day.  (Tr. 426-27).

He would be able to sit or stand for twenty minutes before he would need to change positions.

(Tr. 427).  Based on these limitations, Nurse Sargent noted that Ortiz needed the opportunity to

shift at-will between sitting and standing.  Id.  He would need to lie down during the work day,

every one to two hours.  Id.  He could never climb ladders and would occasionally be able to

twist, stoop, crouch, and climb stairs.  (Tr. 428).  She believed Ortiz could perform most physical

functions such as reaching, handling, fingering, and feeling, but she advised against pushing or

pulling actions.  Id.  Ortiz should avoid even moderate exposure to hazards as well as

concentrated exposure to extreme heat and cold, moisture, and humidity.  (Tr. 429).  Based on

---

[17]   Ortiz's therapist is referred to in medical records as Juan C. Ramos, Psy.D.  (Tr. 444).  The
ALJ decision does not specify whether this is a Doctorate of Psychology or Psychiatry.  (Tr. 12);
see Tennenhouse, 1 Attorneys Medical Deskbook at § 5.18 (noting that abbreviation  "Psy" may
refer to psychiatry or psychology).   At any rate, Dr. Ramos may be an acceptable medical source
under the regulations.  See, 20 C.F.R. § 404.1513(d)(1).

his impairments, Nurse Sargent expected Ortiz to miss work about twice a month.  Id.  In support

of her conclusions, she referred to his complaints of "severe chronic back pain," examination

findings, and an MRI showing disc protrusion.  (Tr. 428).

## ALJ HEARING

At the January 11, 2011 hearing, the ALJ received testimony from Ortiz and an impartial

vocational expert.  (Tr. 33-58).  After exploring Ortiz's living and transportation arrangements

and education, the ALJ questioned Ortiz about his work history, course of treatment for chronic

back pain, headaches, mental health, and side effects of the medications he was prescribed.  (Tr.

38-43).  Ortiz described his need to frequently change between sitting and standing positions to

relieve chronic pain.  (Tr. 43).  The ALJ examined Ortiz's ability to complete ADLs -- cooking,

bathing, dressing -- to which Ortiz testified that his wife helped him in most of these activities.

(Tr. 43-44).  Ortiz testified that he rarely left his house, did not participate in clubs or have

hobbies, and did not have a history of drug or alcohol abuse.  (Tr. 44-45).  Ortiz also testified

that he used a cane to relieve pain from walking.  (Tr. 45).

With respect to pain, Ortiz testified about the constant, radiating, tingling nature of his

pain.  (Tr. 46-47).  He said that because the pain radiates down his right leg, he feels at risk of

losing balance when standing or walking.  (Tr. 47).  Ortiz testified that he had some success with

a TENS unit, which assisted him in sleeping one to two hours uninterrupted.  (Tr. 48).  Ortiz's

attorney also questioned him about what exacerbated his pain, how frequently his headaches

occurred and their duration, as well as the symptoms and success of therapy in treating his

mental health.  (Tr. 46-52).

Following Ortiz's testimony, the ALJ then asked the vocational expert for her assessment

of the skill and exertional levels of Ortiz's work history.  She described Ortiz's work history in

automotives as skilled, but did not describe the exertional capacity of this occupation.  (Tr. 53).

The ALJ then asked the vocational expert to consider

> a hypothetical individual [Ortiz's] age, education, work history. That individual would be limited to what Social Security defines as sedentary work. Work should allow for a sit-stand option at will. Work should be simple and unskilled in nature. Work should not involve the operation of right foot or leg controls.  Work should not entail any overhead lifting or reaching.  Work should not be in environments that have any more than incidental exposure to extremes of cold or vibration. Work should not entail any – for work in heights using ladders, ropes, or scaffolding.  Work should not entail more than occasional – occasional being defined as up to one third of the time – use of ramps, stairs, stooping, crouching, crawling, and kneeling.   Would an individual so limited be able to perform [Ortiz's] past job or other jobs that exist in the local or national economy?

(Tr. 54).

The vocational expert responded that while those limitations would rule out Ortiz's past work from an exertional standpoint, there would be sedentary, unskilled work within the hypothetical.  Id.  Namely, she identified 4,000 small product hand assembler positions, 9,800 small product inspector positions, and 1,600 assembly finisher positions in Massachusetts, and more significant numbers in the national labor market.  (Tr. 54-55).  The vocational expert further testified that if additional limitations of secondary chronic pain, side effects of medication, and one-third time spent off-task were added to the hypothetical, such an individual would be unable to perform these occupations or "any competitive employment on a sustained basis."  (Tr. 55).  On further questioning by Ortiz's attorney, the vocational expert remained firm in her assessment that, even if time spent off-task were reduced to one-fourth (rather than one-third) of the work day, such an individual would still not meet the demands of employment.  (Tr. 56).  She also testified that employers would not tolerate additional breaks of forty minutes to an hour beyond those allotted during a normal day.  Id.

**ALJ DECISION**

On January 26, 2011, the ALJ issued his decision denying Ortiz SSI and DIB.  (Tr. 26).

After reviewing the medical and vocational evidence, the ALJ found that Ortiz had severe,

medically determinable impairments consisting of degenerative disc disease and headaches.

(Tr. 12).  None of his impairments alone or in combination met or equaled a listed impairment.

(Tr. 14).  Acknowledging that Ortiz's medically determinable conditions could reasonably be

expected to cause the symptoms of which he complained, the ALJ found that Ortiz's statements

about the intensity, persistence, and limiting effects of these symptoms were inconsistent with

the ALJ's residual functional capacity ("RFC") assessment, and were not entirely credible.  (Tr.

17-18).  To support his determination that Ortiz overstated his pain, the ALJ cited Ortiz's ability

to perform ADLs as late as June 24, 2009, well after the disability period had allegedly begun.

(Tr. 17).  In addition, the ALJ commented that while Ortiz testified that he still suffered from

severe headaches four to five times a month, the medical records indicated that this issue had

been resolved nearly a year earlier.  Id.  Finally, the ALJ found that the lack of back surgery,

emergency room visits, and psychiatric hospitalizations, along with Ortiz's own reports of

feeling better while on medication, suggested that his impairments were not as limiting as

claimed.  (Tr. 18).

The ALJ concluded that, despite Ortiz's asserted pain, he retained an RFC to perform

limited types of sedentary work.  (Tr. 24).  In support of this determination, the ALJ remarked

that he considered "the medical findings and opinions of the examining physicians, psychiatrist,

and nurse, together with the opinions of the DDS medical consultants[.]"  (Tr. 24).  He assigned

"significant weight" to the state agency consultant opinions based on their familiarity with Social

Security regulations and policy, and what he considered to be their "objective assessments of the

medical evidence as a whole rather than being premised substantially on the self-reported limitations of [Ortiz]."  (Tr. 23).  By contrast, the ALJ accorded "little weight" to the opinion of Nurse Sargent whose assessment was "inconsistent with the objective medical evidence of record, and the claimant's reports of improvement;" moreover, as a nurse practitioner, the ALJ found she was not an "acceptable medical source" under 404 C.F.R. §§ 404.1513 and 416.913, or under SSR-06-3p.  (Tr. 24).  Although he summarized Ortiz's treatment histories with Doctors Stevens, Eck and Mazin, he did not assign any weight to their medical opinions.  (See Tr. 19-23).

The ALJ concluded that Ortiz could perform certain forms of sedentary work given his RFC, age, education, and work experience, even though he could not perform any of his past relevant work as an automotive technician.  (Tr. 24-26).  The ALJ explicitly determined that Ortiz was not capable of performing any sedentary job given his limitations, but that there were suitable forms of employment within the national and local economies to which Ortiz was capable of adjusting.  (Tr. 25-26).  Accordingly, the ALJ considered Ortiz not disabled.  Id.

## STANDARD OF REVIEW

The standard of review is prescribed by statute.  Under 42 U.S.C. § 405(g), this Court has the power to affirm, modify, or reverse the Commissioner's decision, with or without remanding the case for a rehearing.  "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."  42 U.S.C. § 405(g), e.g., Seavey v. Barnhart, 276 F.3d 1, 10 (1st Cir. 2001).  Substantial evidence is "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)); accord Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981) (holding that findings are based on substantial evidence "if a

reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support [the Commissioner's] conclusion").  This Court must affirm the Commissioner's decision, "even if the record arguably could justify a different conclusion, so long as it is supported by substantial evidence." Rodriguez Pagan v. Sec'y of Health & Human Servs., 819 F.2d 1, 3 (1st Cir. 1987) (per curiam).

Thus, based on statute and precedent, this Court's review of the Commissioner's findings of facts is not *de novo*.  "[T]he court's function is a narrow one[,] limited to determining whether there is substantial evidence to support the [Commissioner's] findings and whether the decision conformed to statutory requirements." Geoffroy v. Sec'y of Health & Human Servs., 663 F.2d 315, 319 (1st Cir. 1981).  The Commissioner is given prime responsibility in determining issues of credibility and drawing permissible inferences from the facts presented to her. Lizotte v. Sec'y of Health & Human Servs., 654 F.2d 127, 128 (1st Cir. 1981).  Conflicts within the record are likewise resolved by the Commissioner, not the court. Irlanda Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991).  Nonetheless, the Commissioner's findings of fact are not conclusive when "derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts." Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999) (per curiam). The court may reverse or remand a case based on a legal or factual error so that new evidence or correct legal standards can be considered. Bazile v. Apfel, 113 F. Supp. 2d 181, 190 (D. Mass. 2000) (remanding, rather than reversing, case where improperly discredited testimony created legal error).

"It is incumbent upon the examiner to make specific findings" so that the court may avoid speculating what was the basis for the Commissioner's decision. Id. at 188 (quoting Baerga v. Richardson, 500 F.2d 309, 312-13 (3rd Cir. 1974)).  The basis for this Court's decision

is what is contained in the record and pleadings, 42 U.S.C. § 405(g); thus, where the record and pleadings do not provide explanation sufficient to conclude that the law was correctly applied and that the evidence was duly considered, a remand is in order for further development of the record.  See Seavey, 276 F.3d at 12 ("When an agency has not considered all relevant factors in taking action, or has provided insufficient explanation for its action, the reviewing court should ordinarily remand the case to the agency.").

The foregoing authorities concern the Commissioner's finding regarding whether a person is disabled.  Disability is defined in the Social Security Act as the:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months[.]

42 U.S.C. § 423(d)(1)(A).  The severity of the impairment must be such that the claimant is "not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]"  42 U.S.C. § 423(d)(2)(A).

The statutory framework for determining disability is applied in a five-step analysis.  20 C.F.R. § 416.920(a)(4); Bowen v. Yuckert, 482 U.S. 137, 140 (1987).  The Commissioner first determines if the claimant is engaged in "substantial gainful activity."  20 C.F.R. § 416.920(a)(4)(i).  If he is, then the claimant is not disabled.  Id.  In this case, the ALJ found that Ortiz had not engaged in substantial gainful activity since November 24, 2008, the alleged onset date of his disability.  (Tr. 12).

Having determined the claimant has not engaged in substantial gainful activity, the Commissioner next considers whether he suffers from a severe impairment or combination of impairments.  20 C.F.R. § 416.920(a)(4)(ii).  If no severe impairment is found, the claimant is

considered not disabled and his application is denied.  Id.  Here, the ALJ found Ortiz had severe impairments of degenerative disc disease and headaches.  (Tr. 12).

The framework next requires the Commissioner to determine whether the impairments are equivalent to an impairment listed in Subpart P, Appendix 1 of the Social Security Regulations.  20 C.F.R. § 416.920(a)(4)(iii).  The ALJ found that neither of Ortiz's impairments, nor a combination thereof, met a listing within the Code of Federal Regulations.  (Tr. 14).  Where, as here, the claimant's impairments do not meet a listing, the Commissioner then moves on to step four.  See 20 C.F.R. § 416.920(e).

Under the fourth step, the Commissioner determines whether the claimant retains the residual functional capacity to perform past relevant work.  20 C.F.R. § 416.920(a)(4)(iv).  At this step, the claimant bears the initial burden of proving he can no longer perform his previous work due to his impairments.  Manso-Pizarro v. Sec'y of Health & Human Servs., 76 F.3d 15, 17 (1st Cir. 1996).  The ALJ found that Ortiz met his burden of showing he can no longer work as an automotive technician.  (Tr. 24).

The fifth and final stage of the disability inquiry determines whether the claimant can perform other work in the national economy, in light of claimant's impairments, age, education, and work experience.  20 C.F.R. § 416.920(a)(4)(v); Bowen, 482 U.S. at 142.  The Commissioner must come forward with evidence of specific jobs in the national economy that the applicant can still perform.  Freeman v. Barnhart, 274 F.3d 606, 608 (1st Cir. 2001).  Here, the ALJ determined that Ortiz could perform a limited set of sedentary jobs available in significant numbers in the local and national labor markets.  (Tr. 25-26)  He therefore found that Ortiz was "not disabled."  (Id.)

**DISCUSSION**

Ortiz seeks reversal or remand.  He claims (1) there was not substantial evidence to support the Commissioner's finding that Ortiz's subjective complaints of pain lacked credibility; and, (2) the ALJ failed to consider whether the state agency physicians were qualified to assess Ortiz's medical impairments. The Commissioner opposes those arguments and seeks to affirm the ALJ's decision that Ortiz is not disabled.  Regardless, the Court has identified as a separate issue for remand, the ALJ's failure to assess weight to the medical opinions of treating sources. see 20 C.F.R. §§ 404.1527(b) & (c).  Each argument is addressed below.

1.  The ALJ Properly Evaluated Ortiz's Subjective Complaints of Pain.

As here, when pain is alleged to affect a claimant's ability to work, the Commissioner must evaluate the intensity and persistence of a claimant's symptoms.  20 C.F.R. § 404.1529(c)(1).  The Commissioner considers both objective and subjective evidence regarding the symptoms.  20 C.F.R. §§ 404.1529(c)(3) & (4).  Ortiz claims the ALJ erred by finding his subjective complaints of pain were not credible.

Both the Code of Federal Regulations and precedent established in Avery v. Secretary of Health & Human Services, require an ALJ to inquire about subjective pain when it appears "significantly greater than that which can be reasonably anticipated based on the objective physical findings."  Avery, 797 F.2d at 23; see 20 C.F.R. § 404.1529(c)(3).  The ALJ must consider the so-called Avery factors including:  the location, duration, frequency, and intensity of the claimant's pain or other symptoms; any precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate pain or other symptoms; treatment, other than medication, the claimant receives or has received for relief of pain or other symptoms; any measures other than treatment the claimant

uses or has used to relieve pain or other symptoms (<u>e.g.</u>, lying flat on back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and, a claimant's daily activities.   <u>Id.</u>

Here, the ALJ inquired into Ortiz's subjective pain using the <u>Avery</u> factors.  (Tr. 15-17). For example, the ALJ asked about Ortiz's participation in daily activities such as performing household chores, shopping, and attending appointments.  (Tr. 173-176).  He noted how Ortiz's pain restricted his ability to participate in outdoor activities and to perform some personal care like dressing and bathing.  (<u>Id.</u>)   The ALJ questioned Ortiz about his pain and its precipitating and aggravating factors, such as standing or sitting in one position for extended periods of time. (Tr. 16).  He asked Ortiz about his efforts to alleviate pain through medications and treatments. (<u>Id.</u>)   The ALJ noted that injections made his pain worse and that medications caused some negative side-effects, but were also partly effective.  (Tr. 16-17).  Based on his analysis of the <u>Avery</u> factors, the ALJ found Ortiz's subjective complaints of pain to be "overstated" and "inconsistent with the documentary evidence of records and the medical evidence of record." (Tr. 17).  The ALJ cited Ortiz's ability to "drive, shop, pay bills, and clean" as activities inconsistent with the severity of pain Ortiz described.  (<u>Id.</u>)

Ortiz argues that his performing some basic daily activities does not support a finding that he can sustain full-time employment.  Ortiz is correct that a claimant's ability to participate in limited household chores, in and of itself, does not prove a claimant's ability to engage in substantial gainful activity, <u>Dadis v. Chater</u>, 956 F. Supp. 45, 54 (D. Mass. 1997); but, here, the ALJ used the <u>Avery</u> factors not to support the residual functional capacity finding, but to assess Ortiz's subjective complaints of pain.  <u>See</u>, 20 C.F.R. § 404.1529(c)(3).  An ALJ is entitled to consider participation in daily activities in assessing a claimant.  <u>See</u>, <u>Teixeira v. Astrue</u>, 755 F. Supp. 2d 340, 347 (D. Mass. 2010) (finding hearing officer properly discounted claimant's

credibility where her daily activities suggested her pain was not as disabling as claimed) and cases cited.

While Ortiz and his attorney may dispute the ALJ's credibility assessment, so long as the assessment is supported with findings as it was here, particular deference is due to the ALJ's findings of credibility.  See, Ortiz v. Sec'y of Health & Human Servs., 890 F.2d 520, 523 (1st Cir. 1989) ("We pay 'particular attention' to an ALJ's evaluations of complaints of pain in light of their 'subjective nature.'"); Frustaglia v. Sec'y of Health & Human Servs., 829 F.2d 192, 195 (1st Cir. 1987); Bazile v. Apfel, 113 F. Supp. 2d  181, 194 (D. Mass. 2000) ("It is incumbent upon the examiner to make specific findings – the court may not speculate as to his findings.") (quoting Baerga v. Richardson, 500 F.2d 309, 312 (3d. Cir. 1974)).

Moreover, the ALJ noted several other reasons for discrediting Ortiz.  He discussed how Ortiz's testimony regarding recurring headaches contrasted with the medical records that indicated his headaches had resolved a year earlier.  (Tr. 17).  He also posited that Ortiz's lack of surgery or hospitalization for his impairments undermined his claim that the pain was disabling. (Tr. 18).  And, he discussed how medication had helped Ortiz's pain.  (Id.).

Accordingly, ample evidence supports the ALJ's finding that Ortiz overstated his pain and was not entirely credible, and that finding is entitled to deference.  Lizotte, 654 F.2d at 128.

2.  The ALJ's Findings Regarding Medical Opinions Require Further Proceedings.

The ALJ is required to consider and evaluate all the medical opinions in a claimant's case record.  See 20 C.F.R. §§ 404.1527(b) & (c).  "Medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including [a claimant's] symptoms, diagnosis and prognosis, what [a claimant] can still do despite impairment(s), and [a claimant's] physical or

mental restrictions."  20 C.F.R. § 404.1527(a)(2).  When determining the weight to give a medical opinion, the ALJ considers the following factors, among others: (1) the length of treatment and frequency of examination; (2) the consistency of the opinion with the record as a whole; and (3) the specialization of the medical source.  See 20 C.F.R. § 404.1527(c).

Here, the record fails to demonstrate that the ALJ considered and evaluated all the medical opinions as required.  The record reflects only that the ALJ accorded "significant weight" to the two non-examining, non-testifying state agency consultants, and  gave "little weight" to the nurse practitioner whose notes provided a detailed, longitudinal picture of the claimant's medical condition.  As is discussed below, the ALJ must more fully support his opinion.

A.   The weight afforded to state agency medical opinions lacked foundation.

Ortiz argues the ALJ erred in according "significant weight" to the opinions of the non-examining, non-testifying state agency consultants whom, he argues, were not qualified to assess his impairments.  (Docket #15, p.15).  Ortiz claims it was error for the ALJ to rely on the opinions of a speech pathologist (Shankar Narayan) and a neonatologist (Romany Hakeem Girgis, M.D.).  Or, at least, Ortiz argues the ALJ should have explained why he believed their opinions to be valid considering their areas of medical expertise are unrelated to Ortiz's orthopedic impairments.  The Commissioner disputes this argument, arguing the regulations and case law allows consultants to offer opinions outside their specialty.  [Docket # 17, pg. 13].  While both sides argue persuasive points, this Court finds balancing the factors set-forth in the regulations requires that the ALJ more fully support his findings on remand.

Under 20 C.F.R. §§ 404.1527(e)(2)(i)-(iii), an ALJ must consider state agency medical consultants' opinions, but he is not bound by them.  The regulations require the ALJ to evaluate

the opinions using certain factors, such as the consultant's medical specialty, his expertise in social security rules, the supporting evidence in the case record, the supporting explanations provided, and "any other factors relevant to the weighing of the opinions."  20 C.F.R. § 404.1527(e)(2)(ii).  Addressing these relevant factors does not necessarily require discussion of each, if the explanation is sufficient to demonstrate that the determination of weight was supported by substantial evidence.  See, Morales v. Comm'n of Soc. Sec., 2 Fed. Appx. 34, 36 (1st Cir. 2001).  But see, Vazquez-Rivera v. Comm'n of Soc. Sec., 943 F. Supp. 2d 300, 309 (D.P.R. 2013) (remanding because ALJ did not adequately explain the reduced weight given to the consultant's opinion).  "The amount of weight that can properly be given to the conclusions of non-testifying, non-examining physicians 'will vary with the circumstances, including the nature of the illness and the information provided by the expert.'"  Rose v. Shalala, 34 F.3d 13, 18 (1st Cir. 1994) (quoting Berrios Lopez v. Sec'y of Health & Human Servs., 951 F.2d 427, 431 (1st Cir. 1991) (per curiam)).  Accordingly, the regulations require the ALJ to support the weight accorded the opinions by substantial evidence.  In the Court's view, the ALJ must explain his assessment of the consultants to meet this standard.

The ALJ gave "significant weight" to the consultants' opinions for two reasons:  (1) the consultants are familiar with SSA policy and regulations; and, (2) their opinions appeared "to be objective assessments of the medical evidence as a whole, rather than being premised substantially on the self-reported limitations of the claimant."  (Tr. 23).  In the circumstances of this case, these reasons, either standing alone or together, fail to demonstrate why the consultants' opinions merited "significant weight."

First, while these consultants may have been familiar with social security rules, neither appears to have medical experience regarding Ortiz's impairments.  Ortiz claims Mr. Narayan is

a speech pathologist and Dr. Girgis is a neonatologist.  (Docket #15, p. 16).  The Commissioner

does not refute these claims; instead the Commissioner acknowledges "neither state agency

doctor had a specialty in orthopedics."  (Docket #17, p.13).  While neither consultant is required

to specialize in orthopedics to evaluate Ortiz's records, if Mr. Narayan is a speech pathologist as

alleged, then Mr. Narayan's specialization would have been an important factor to consider in

light of other provisions within the regulations, such as 20 C.F.R. § 404.1513(a)(5), which limits

use of medical findings made by speech pathologists to issues of speech or language

impairments.  It appears Mr. Narayan may not be an acceptable medical source for Ortiz's

alleged disability.  Likewise, if Dr. Girgis is a neonatologist, then the ALJ would be expected to

explain why his opinion is given significant weight.  Just as familiarity with SSA rules is a

factor, so too is the medical specialty of the consultant.  20 C.F.R. § 404.1527(e)(2)(ii).

Arguably, the ALJ need not have made written findings about every factor that he considered,

see id.; but, the fact the consultants specialize in neonatology and speech pathology suggests an

explanation is owed.  See 20 C.F.R. §§ 404.1527(c)(5) & (e)(2)(ii).

Second, the ALJ highlighted the consultants' "objective assessments" as being important

to his findings, but it is unclear what he means.  The opinions themselves consist largely of

conclusory determinations unsupported by citation to specific evidence or separate findings of

fact.  (Tr. 307-14, 375).  For example, Mr. Narayan's assessment consists almost entirely of

checked boxes with little elaboration, and Dr. Girgis merely submitted one paragraph describing

the medical records he reviewed and his opinion affirming Mr. Narayan's previous assessment.

(Id.).  Moreover, neither consultant actually examined Ortiz.  Many of Ortiz's complaints are of

a neurologic nature.  It is unclear how the ALJ could give significant weight to opinions by non-

examining consultants regarding subjective claims, without the consultants actually observing Ortiz.  Judicial review is unworkable without elaboration.

Finally, while the opinions were certainly entitled to some weight, the ALJ accorded them significant weight over the opinions of examining care-providers with expertise in areas related to Ortiz's impairments, without sufficient support for his finding.  Rose v. Shalala, 34 F.3d at 18.  In this regard, the ALJ erred and the case must be remanded for further explanation.

B.   The "little weight" accorded to Nurse Practitioner Sargent

The ALJ accorded "little weight" to Nurse Sargent's assessment because she is not an "acceptable medical source," see 20 C.F.R. 404.1513, and because he found her assessment was "inconsistent with objective medical evidence of record and the claimant's reports of improvement with respect to his symptoms of pain with the use of medications."  (Tr. 24).  This was error.  First, while Nurse Sargent's opinion is not entitled to "controlling weight" because she is not a physician, 20 C.F.R. § 404.1513(d)(1); see S.S.R. 06-03P, 2006 WL 2329939 at *1-2 (Aug. 9, 2006), she is "[a]nother medical source," 20 C.F.R. § 404.1513(d), and as such, the ALJ may not simply ignore her notes and opinions; rather, he should adequately explain the weight assigned to her opinion.  See, Taylor v. Astrue, 899 F. Supp. 2d 83, 88 (D. Mass. 2012) (noting an ALJ should explain his treatment of the opinion so that a reviewer can determine if the decision is supported by substantial evidence).  A recent decision from this District and guidance propounded by the Social Security Administration suggest using the same evaluative factors for other medical source opinions as those used for evaluating the opinions of treating physicians. Compare Balaguer v. Astrue, 880 F. Supp. 2d 258, 270 (D. Mass. 2012) (reciting S.S.R. 06-03P interpretation that factors for evaluating acceptable medical source opinions may be applicable to medical opinions from "other sources"); and S.S.R. 06-03P at *03-05 (S.S.A.), 2006 WL

2329939 ("With the growth of managed health care...medical sources who are not 'acceptable medical sources,' such as nurse practitioners... have increasingly assumed a greater percentage of the treatment and evaluation functions...[and their opinions] are important and should be evaluated on key issues such as impairment severity and functional effects.") with Hardin v. Barnhart, 468 F. Supp. 2d 238, 250 (D. Mass. 2006) (finding that nurse practitioner was not an acceptable medical source and opinion did not have to be evaluated in manner as treating source).

Second, it appears that Ortiz's primary care provider was Lana Sargent, Nurse Practitioner at the Worcester Family Health Center.[18]  Ortiz saw her frequently between 2006 and 2011.  The ALJ's failure to state specific facts that support the weight given to Nurse Sargent's opinion is unsatisfactory.  Taylor, 899 F. Supp. 2d at 88-89 (finding that ALJ decision failed to cite specific evidence explaining how nurse's opinion was "not inconsistent with" ALJ's other findings).  While resolving conflicts is within the Commissioner's power, Irlanda Ortiz, 955 F.2d at 769, the ALJ's conclusory explanation for assigning Nurse Sargent's opinion little weight would require this Court to speculate about which inconsistencies he found.  Taylor, 899 F. Supp. 2d at 88.  Notably, Nurse Sargent was Ortiz's most consistent and longest-serving primary care provider and, as such, offered an abundance of medical observations and reports. Her role, more than any other, offered important evidence similar to those of treating source opinions including a "detailed, longitudinal picture[;] a unique perspective [of] the medical evidence that cannot be obtained from the objective medical findings alone or from reports of

---

[18]    It is unclear to this Court whether Ortiz had a treating physician as well as a treating nurse practitioner.  Some reference in Nurse Sargent's progress reports is made to Dr. Maxted of the Family Health Center in Worcester, and several reports are jointly signed by Dr. Maxted and Nurse Sargent.  (Tr. 336, 339, 341).  No separate opinion by Dr. Maxted appeared within the record, nor was such an opinion discussed by the ALJ in his decision.

individual examinations, such as consultative examinations or brief hospitalization." Tetreault, 865 F. Supp. 2d at 120 (quoting 20 C.F.R. § 416.927(d)(2) to explain deference to opinions of treating physicians).  In light of this, this Court suggests that on remand, the ALJ cite evidence and give fact-supported reasons, not merely references, to explain his assessment of Nurse Sargent's opinions.  See Seavey, 276 F.3d at 12 (finding insufficient explanation for agency's action usually requires remand).

C.  There was no weight ascribed to certain medical opinions

The Code of Federal Regulations provides that "[m]edical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [the claimant's] impairment(s), including [the claimant's] symptoms, diagnosis and prognosis, what a [claimant] can still do despite impairment(s), and [the claimant's] physical or mental restrictions."  20 C.F.R. § 404.1527(a)(2).  The record is replete with medical opinions regarding Ortiz's back pain, headaches, and depression from Doctors Eck, Stevens, and Mazin, chiropractor James Convery, and a registered physical therapist; however, none of the opinions were accorded weight by the ALJ.[19]  (See Tr. 18-24).

The regulations require the ALJ to consider and evaluate every medical opinion submitted.  20 C.F.R. §§ 404.1527(b) & (c).  Unless an ALJ accords "controlling weight" to an opinion (and he did not here) the regulations obligate the ALJ to consider all of the following factors:  (1) examining relationship -- pledging to give more weight to a source who has examined claimant than has not; (2) treatment relationship -- a claimant's own physician,

---

[19]  "Acceptable medical sources" are defined as "one of the sources described in [20 C.F.R.] section 404.1513(a)."  Id.  This includes licensed physicians and licensed or certified psychologists.  20 C.F.R. § 404.1513(a).  Only acceptable medical sources may give medical opinions entitled to controlling weight.  S.S.R. 06-03p, 2006 WL 2329939 at *1-2 (Aug. 9, 2006).

psychologist, or other medical source who has provided treatment in an ongoing relationship; (3)

supportability -- the better explained the more weight given; (4) consistency; (5) specialization;

and, (6) other factors -- such as familiarity with SSA programs and other records in the

claimant's file.  20 C.F.R. § 404.1527(c).

Here, the ALJ did not carry out his duties under the regulation.  While the ALJ's findings

summarize the observations of each of these doctors, the findings lack any evaluation or

indication of the weight he accorded to their opinions.   Instead, when addressing the medical

opinions, the ALJ merely alluded to "medical findings and opinions of the examining physicians

[and] psychiatrist" as information he considered.  (Tr. 24).  The influence these opinions had on

the ALJ's determination of Ortiz's RFC is unclear.  These medical providers observed Ortiz

first-hand and drew conclusions.  (e.g., Tr. 261, 262, 392).   All reported symptoms of pain, and

created medical records reflecting judgments about the nature and severity of Ortiz's alleged

impairments, consistent with what is required by the regulations.  See 20 C.F.R.

§ 404.1527(a)(2).  For example, the records created by Dr. Mazin reflect his observations on

physical examination, interpretations of x-rays, and treatment plans, with notes throughout

regarding observations of Ortiz's pain.   (Tr. 260 – 266).  The ALJ should have stated how the

medical opinions, including those by Dr. Mazin, were evaluated, including an assessment of the

various factors in weighing those opinions.  20 C.F.R. § 404.1527(d)(2)(6); Angster v. Astrue,

703 F. Supp. 2d 1219, 1230 (D. Colo. 2010).   It was error for the ALJ to not evaluate the

doctors' medical opinions.  See 20 C.F.R. § 404.1527(a)(2); 20 C.F.R. § 404.1527(c)

("Regardless of its source, [the Commissioner] will evaluate every medical opinion [he]

receive[s].") (emphasis added).  Such legal error merits remand for further development of the

record.  See, Wade v. Astrue, 268 Fed. Appx. 704, 706 (10th Cir. 2008) (unpublished) (Tenth

Circuit remanded case to the Commissioner due to the ALJ's failure to assign weight to opinion of treating physician: "We cannot simply presume the correct legal standards in considering [the doctor's] opinion.").

On remand, the ALJ is advised to evaluate all medical opinions, including indicating whether he considered the providers to be treating sources, and to state whether they influenced his RFC determination.

### CONCLUSION

For the foregoing reasons, this court recommends to the District Judge that the Defendant's Motion to Affirm (Docket #16) be DENIED, that the Plaintiff's Motion to Reverse and Remand (Docket #14) be ALLOWED, and the matter be remanded to the ALJ for further proceedings[20] consistent with this report and recommendation.[21]


So ordered.


                              */s/ David H. Hennessy*
                              David H. Hennessy
                              United States Magistrate Judge

---

[20]   This Court expresses no opinion as to the appropriate outcome of additional administrative proceedings.

[21]   The parties are hereby advised that, under the provisions of Federal Rule of Civil Procedure 72, any party who objects to these proposed findings and recommendations must file specific written objections thereto with the Clerk of this Court within fourteen days of the party's receipt of this Report and Recommendation. The written objections must specifically identify the portion of the proposed findings, recommendations, or report to which objections are made and the basis for such objections. The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with Rule 72(b) will preclude further appellate review of the District Court's order based on this Report and Recommendation. See Keating v. Sec'y of Health & Human Servs., 848 F.2d 271, 275 (1st Cir. 1988); United States v. Emiliano Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986); United States v. Vega, 678 F.2d 376, 378-79 (1st Cir. 1982); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 604-05 (1st Cir. 1980); see also Thomas v. Arn, 474 U.S. 140 (1985).